UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ANDRE GESKE,                                    Case No.: 22-21536-CIV-MORENO

    Plaintiff,
v.

700 EDGEWATER DEVELOPMENT, LLC,

    Defendant.
_____/

## AMENDED COMPLAINT

Plaintiff Andre Geske complains against Defendant 700 Edgewater Development, LLC, a Delaware limited liability company, and states:

### NATURE OF ACTION

1. In this action, Plaintiff is seeking damages for Defendant's anticipatory repudiation of its agreement to sell him a preconstruction custom-built luxury condominium duplex apartment and for Defendant's breach of its duty of good faith and fair dealing.

### PARTIES

2. Plaintiff Andre Geske is a citizen of the Federal Republic of Germany and is not a permanent resident of the State of Florida, the State of Delaware, or another jurisdiction of the United States or one of its political subdivisions.

3. Defendant 700 Edgewater Development, LLC is Delaware-chartered limited liability company with its principal place of business in Miami, Florida.

### JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action under 28 U.S.C §1332(a)(2) because this is an action between "citizens of a State and citizens or subjects of a

1

foreign state," and Plaintiff is not lawfully admitted for permanent residence in the United States while domiciled in the State of Florida or in the State of Delaware.

5. Pursuant to the Purchase Agreement that is the subject of this action, the parties contractually agreed to submit to the exclusive jurisdiction of the federal and state courts in Miami-Dade County, Florida for all actions arising in connection with their contract.

6. Venue is proper in this district under 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here and/or a substantial part of property that is the subject of the action is situated here.

## COMMON ALLEGATIONS

7. Defendant is the developer of a 57-story luxury residential condominium high rise that is being built at 700 N. E. 26th Terrace, Miami, Florida 33137. The project legally is known as the 700 Edgewater Condominium but is branded and marketed as "Mission Baia." (hereafter, "700 Edgewater," "Condominium" or "Mission Baia"). Defendant has been selling the condominium units preconstruction.

8. In early 2020, during the early stage of the Coronavirus pandemic, Plaintiff was interested in purchasing a custom-designed luxury waterfront residence in a condominium high rise in Miami. Plaintiff's real estate salesperson introduced him to the 700 Edgewater/Mission Baia project. Defendant gave Plaintiff its sales and marketing materials, drawings and other project representations and made oral representations about available project amenities.

9. After involved discussions, Plaintiff decided he wanted to buy a two-level penthouse apartment (extending from the 56th floor to the 57th floor) in 700 Edgewater, provided Defendant would customize the unit to suit his particular needs and standards. Plaintiff's requirements would necessitate combining two apartment units, one above the other, as the project did not offer two level or duplex units. Plaintiff gave Defendant a list of the amenities he

2

wanted to be installed in the proposed combined unit. These amenities predominantly required custom-fabrication and, in some cases, sourcing outside of the United States.

10. Plaintiff and Defendant then engaged in intensive discussions about the proposed purchase. They discussed terms whereby Defendant would sell Plaintiff units 5603 and 5703 as a combined two level condominium unit (hereafter, the "Unit"). The Unit would be connected by a customized staircase and equipped with the amenities Plaintiff wanted. The purchase terms that Plaintiff proposed varied substantially from Defendant's standard purchase agreement, an adhesion contract that Defendant offers to all potential buyers on a take it or leave it basis except as to the selling price.

11. During the negotiations, Plaintiff informed Defendant he wouldn't enter a transaction in reliance upon oral promises or which was limited to Defendant's standard purchase agreement. To induce Plaintiff to purchase the Unit, Defendant agreed to vary from its customary practice and negotiate mutually agreeable terms for the purchase. Thereafter, the parties, through their legal counsel, negotiated a contract addendum to modify and supersede Defendant's standard purchase agreement with the additional terms the parties had negotiated.

12. On February 20, 2020, Plaintiff and Defendant entered a written agreement for plaintiff's purchase of the Unit. It consists of: Defendant's developer standard purchase agreement (hereafter, "Standard Purchase Agreement"), Defendant's form addendum providing Plaintiff with additional parking spaces and the contract addendum the parties negotiated, titled "Amendment to Agreement" (hereafter, the "Addendum"). These instruments collectively are referred to herein as the "Purchase Agreement." A copy of the Purchase Agreement is attached hereto as Exhibit "A" and incorporated herein.

13. Under the Purchase Agreement, Plaintiff agreed to buy the Unit for $9.6 million. Defendant agreed to substantially complete the Unit by June 30, 2021, *i.e.*, render it habitable.

14. The Purchase Agreement required Plaintiff to pay Defendant a $1,920,000 deposit within ten (10) business days of its execution, an additional $960,000 deposit not later than ten (10) business days after notice from Defendant that the 57th floor concrete slab had been poured and the remainder of the $9.6 million purchase price at closing, with Plaintiff to receive a closing credit of $150,000. To date, Plaintiff has timely met all pre-closing financial and other requirements under the Purchase Agreement.

15. The Purchase Agreement expressly details the particularized requirements for Defendant to furnish and equip the Unit and ready it for closing. They include customary items such as flooring and drywall. The Purchase Agreement also provides for substantial enhancements over what Defendant customarily provides under its Standard Purchase Agreement. These specialized amenities include, among other things, dropped ceilings, a customized lighting system, upgraded appliances, upgraded front and interior doors, a Crestron-brand home automation/information system, upgraded bathroom and kitchen fixtures and plumbing and vanities, specialized reinforced drywall and changes to the drywall design – the requirements of which were to be furnished thereafter by Plaintiff – as well as other spatial modifications to the Unit's design, a custom-designed staircase to connect the 56th and 57th floors and options for fireplaces, an outdoor balcony kitchen and a private pool. Finally, Defendant is required to paint the Unit's walls and ceilings with the specialized upgraded white paint: RAL 9010.

16. Sections 14 and 15 of the Standard Purchase Agreement confer broad discretion upon Defendant to meet its contractual obligations to construct, design and furnish the Unit and to change its plans, designs and specifications at its sole option. But Paragraph 28 of the Addendum to the Purchase Agreement modifies Sections 14 and 15, severely constraining Defendant's discretion. Paragraph 28 provides that:

4

> The parties agree that the phrase "Without limiting Sections 14 and 15 of the Agreement" as used in this Amendment shall be limited to only allow Seller to make minimal changes to its plans that conflict with the provisions set forth in this Amendment only as is necessary to accommodate governmental requirements and reasonable field construction needs, it being the intention of the parties that Seller uses a heightened sense of commercially reasonable efforts to all times strictly comply with all requirements set forth in this Amendment and to only minimally deviate from such requirements where absolutely necessary for the limited reasons set forth above. Accordingly, in the event of a conflict between the provisions set forth in this Amendment and Sections 14 and 15 of the Agreement, the provisions of this Amendment prevail subject only to the limited exceptions set forth in this paragraph.

17. Thus, Paragraph 28 of the Addendum empowers Defendant to "make minimal changes to its plans that conflict with the provisions set forth in this Amendment *only* as is necessary to accommodate governmental requirements and reasonable field construction needs." (Emphasis Added). In fact, Defendant's exceedingly narrow discretion to make even minimal construction changes further is limited by the requirement that it use "a *heightened sense of commercially reasonable efforts to all times strictly comply with all requirements set forth in this Amendment and to only minimally deviate from such requirements where absolutely necessary for the limited reasons set forth above*." (Emphasis Added).

18. Moreover, the Addendum's pivotal role is memorialized. Paragraph 26 of the Addendum provides that "[t]he parties hereby acknowledge and agree that but for Seller's agreement to execute this Amendment Buyer would not be contemporaneously executing the Purchase Agreement." Thus, without Defendant's agreement to the Addendum, Plaintiff never would have entered the transaction.

19. After the parties executed the Purchase Agreement, Plaintiff worked to provide Defendant with the required information to customize, equip and furnish the Unit as per the Purchase Agreement. Defendant, however, dragged its feet, and showed a strange reluctance to

move the Unit forward toward completion. Nor was Defendant fully responsive to the communications it received from Plaintiff's representative Gerd Damrath, who like Plaintiff, resides in Germany. In response, Plaintiff hired a project management team in Miami headed by Jorge Pinto of Intelligent Construction, Inc. to engage with Defendant by, among other things, gathering the information Defendant needed from Plaintiff, working with Defendant to ensure that all materials and amenities were ordered and conformed to contract requirements, regularly meeting with Defendant's representatives to set performance timetables and goals for readying the Unit for closing. and generally pressing Defendant to perform its contractual duties.

20. During an April 8, 2022 meeting, Defendant's representatives informed Mr. Pinto and his assistant Karina that Defendant planned to obtain a temporary certificate of occupancy ("TCO") for the condominium building in July 2022 and to work out the remaining finishing issues for the Unit within the following four weeks.

21. Then, suddenly, on April 25, 2022, in repudiation of the Purchase Agreement, Defendant's agent, Vanessa Grout, sent Mr. Damrath, Plaintiff's agent, the following email, a copy of which is attached hereto as Exhibit "B," advising:

> Since we are about to obtain TCO for Missoni Baia and cannot make any more changes to our permitting process/construction schedule, we have finalized our analysis of credits owed to you per the amendment to your purchase agreement. Unfortunately, we are not able to accommodate all of the original requests, as well as the long lead items such as the lighting package. So as not to delay the building's delivery, developer will deliver the combined unit 5603/5703 as an unfinished shell with front doors and the concrete staircase installed, honed Bianco Neve material installed on the terrace and all credits applied to the purchase price as listed below:
>
> Credits to Buyer
>
> Drop ceilings (cost) - $20,000
>
> Base lighting (cost + 15%) - $2,723

>Standard doors (cost + 15%) - $15,794
>
>Crestron -$75,000
>
>Kitchen/ bath credit – (cost + 15%) Unit 5703 and Unit 5603 $53,195 and $47,325.
>
>28 art backing locations (cost) - $7,000
>
>Paint (cost) - $9,500
>
>Interior Flooring (cost) - $103,632.
>
>Total credits $334,171.
>
>Please let me know if you would like to schedule a call to further discuss.

22. Contrary to Ms. Grout's email, however, the Condominium building was far from complete. Her statement that Defendant was about to obtain a TCO – a temporary certificate of occupancy – for the Condominium building was in direct contradiction to Defendant's April 8, 2022 representations to Plaintiff and all of its prior representations since the transaction's inception, which indicated it was carrying out its duties under the Purchase Agreement.

23. In fact, sometime after the parties had signed the Purchase Agreement, Defendant had changed its mind and no longer was willing to go forward with the transaction. Defendant's *volte-face* apparently was prompted by its assessment of the true costs of its required contractual performance and the unbuilt Unit's substantial appreciation in value since the execution of the Purchase Agreement. Yet the parties were on notice of these risks and conditions when they entered the transaction. But Defendant never informed Plaintiff of its changed position until April 25, 2022. In the meantime, Plaintiff incurred substantial costs through the work of his professionals charged with interacting with Defendant so the Unit would be ready to close.

24. On May 2, 2022, before the filing of this action, undersigned counsel sent a letter

to Defendant by next day delivery demanding compliance with the Purchase Agreement but Defendant failed to respond. A copy of this letter is attached hereto as Exhibit "C."

25. The Purchase Agreement provides for the recovery of attorneys' fees and costs by the prevailing party in the event an action is filed to enforce it.

26. Plaintiff has retained the services of undersigned counsel and is required to pay counsel's reasonable fees and costs.

27. All conditions precedent to this action have been waived, satisfied or excused.

## COUNT I – ANTICIPATORY BREACH/REPUDIATION OF CONTRACT

28. Plaintiff adopts and realleges the allegations contained in paragraphs 1 through 27 above as paragraph 28.

29. On February 20, 2020, Plaintiff and Defendant entered the Purchase Agreement. The Purchase Agreement is a fully integrated contract which sets forth the parties' obligations. Among other things, the Purchase Agreement requires Defendant to deliver the Unit to Plaintiff with specified amenities and in the described condition at Defendant's sole cost in return for the consideration already paid by Plaintiff and the future consideration to be paid at the closing.

30. Pursuant to Ms. Grout's April 25, 2022 email to Mr. Damrath, Defendant unambiguously announced its total material repudiation of the Purchase Agreement by refusing to complete the Unit as contractually required. Defendant's contractual repudiation will prevent Plaintiff from receiving the Unit in the condition and with the features Defendant promised.

31. Ms. Grout's April 25, 2022 email further stated Defendant would give Plaintiff a $334,171 credit for its unperformed work and materials. Yet, the Purchase Agreement does not grant Defendant the legal right to credit Plaintiff for work it chooses not to do in lieu of compliance. Moreover, Defendant's $334,171 credit offer for unfinished work is an admission of its breach of the Purchase Agreement. And Defendant's $334,171 offered credit is a mere

fraction of Plaintiff's cost to acquire and install the items and complete the Unit.

32.     Because the Purchase Agreement is a bargained for contract with consideration exchanged, one party cannot unilaterally modify its terms. Moreover, the Purchase Agreement expressly provides that it cannot be modified except in a writing signed by all parties. Consequently, for this reason too, Ms. Grout's April 25, 2022 email purporting to change the terms of the Purchase Agreement constitutes a contractual repudiation.

33.     Plaintiff is in compliance with the Purchase Agreement and has fulfilled all requirements incumbent upon him as of the date of Defendant's repudiation.

34.     Defendant has ignored Plaintiff's demand that it comply with its contractual obligations under the Purchase Agreement.

35.     As a direct and proximate result of Defendant's repudiation of the Purchase Agreement, Plaintiff has been damaged. But for Defendant's breach, Plaintiff would not have sustained his losses.

WHEREFORE, Plaintiff Andre Geske demands judgment against Defendant 700 Edgewater Development, LLC for compensatory damages in accordance with the proof at trial, interest, costs, reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

**COUNT II – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

36.     Plaintiff adopts and realleges the allegations contained in paragraphs 1 through 27 as paragraph 36.

37.     Inherent in the Purchase Agreement, as in every contract, is the implied duty of each contracting party to act in good faith and fairly deal with the other party so that his reasonable contractual expectations are not thwarted.

38.     After the parties entered the Purchase Agreement, Defendant developed a case of "seller's remorse." It was triggered by several factors. First, Defendant determined its actual

9

costs and labor skill requirements for delivering the Unit as promised to Plaintiff and found them to be more expensive and difficult to meet than it had anticipated. Second, inflationary pressures and supply shortages markedly had increased the cost of goods and services Defendant would need to pay for to complete the Unit. Finally, as the Coronavirus pandemic faded, property values in South Florida had substantially increased, with the Unit's value, as a completed apartment, now far exceeding what Plaintiff had agreed to pay for it.

39. Because of the foregoing, Defendant was reluctant to carry out its duties under the contract and deliberately resisted Plaintiff's efforts to arrange the selection of materials, products and services needed to complete the Unit. Defendant apparently hoped that by quietly stalling its performance, Plaintiff would become so frustrated he would ask to be let out of the Purchase Agreement so he could get a refund of his contract deposits, which total nearly $3 million. That in turn would allow Defendant to complete the Unit and resell it to another buyer for a much higher price than Plaintiff had agreed to pay for it without having to make all of the expensive improvements the Purchase Agreement requires.

40. Defendant upped the ante with Ms. Grout's April 25, 2022 email after Plaintiff continued pressing Defendant to cooperate in readying the Unit for closing. Citing a purported need to obtain a temporary certificate of occupancy for the Condominium building as a pretext, Ms. Grout's email was sent under the color of its limited powers under the Purchase Agreement to unilaterally modify the Unit's construction plans. Defendant apparently hoped Ms. Grout's email would prompt Plaintiff to finally throw in the towel and seek the termination of the Purchase Agreement and the refund of his substantial deposits.

41. Defendant's actions are a deliberate, willful and premeditated abuse of its duty to act with "a heightened sense of commercially reasonable efforts to all times." As set forth in Paragraph 28 of the Addendum, Defendant may only make "minimal changes to its plans that

conflict with the provisions set forth in this Amendment only as is necessary to accommodate governmental requirements and reasonable field construction needs" and must "strictly comply with all requirements set forth in this Amendment and to only minimally deviate from such requirements where absolutely necessary for the limited reasons set forth above."

42.  Defendant's conduct has delayed delivery of the Unit to Plaintiff and: (1) unfairly frustrated the Purchase Agreement's agreed common purpose, (2) negated the Addendum, which is the linchpin of the Purchase Agreement, and without which Plaintiff would not have entered the transaction, (3) thwarted Plaintiff's reasonable expectations by reallocating the risks and rewards under the contract, and (4) deprived Plaintiff of the benefits of the bargain.

43.  As a direct and proximate result of Defendant's breach of its implied duty of good faith and fair dealing, Plaintiff has been damaged. But for Defendant's breach, Plaintiff would not have sustained his losses.

WHEREFORE, Plaintiff Andre Geske demands judgment against Defendant 700 Edgewater Development, LLC for compensatory damages in accordance with the proof at trial, interest, costs, reasonable attorneys' fees and such other and further relief this Court deems just and proper.

Dated this 23rd day of December, 2022.

        STEVEN F. SAMILOW, P. A.
        1792 Bell Tower Lane
        Weston, FL 33326
        Tel: (954) 315-3612 / Fax: (954) 252-4502

By:    *s/Steven F. Samilow*
        Steven F. Samilow
        Florida Bar No.: 769142
        Email: stevens@samilowlaw.com

*Counsel for Plaintiff Andre Geske*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 23, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will provide electronic notice to all counsel of record.

s/Steven F. Samilow
Steven F. Samilow
